# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 19-1529V

|  |  |
|---|---|
| MARICELLA GARCIA,<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: March 21, 2025 |

*Jessica Olins, Maglio Christopher & Toale, PA, Washington, DC, for Petitioner.*

*Mark Kim Hellie, U.S. Department of Justice, Washington, DC, for Respondent.*

## PARTIAL RULING ON DAMAGES[1]

On October 2, 2019, Maricella Garcia filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") which meets the Table definition for SIRVA related to the influenza vaccine she received on November 2, 2018. Petition at ¶¶ 3, 15. Respondent conceded entitlement, but the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Approximately 18-months after I determined Petitioner was entitled to compensation, the parties informed me that they had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed Sept. 9, 2022, ECF No. 58. Prior to this request, I had approved the retention of an economist and life care planners. Orders, issued Jan. 15 and Oct. 22, 2021, ECF Nos. 34, 47. While

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$190,000.00 for past pain and suffering.** The remaining damages categories to be decided require additional input from the parties before they can be resolved.

## I.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my

---

the parties were finalizing their briefs, I approved the retention of orthopedic experts to opine on the extent of Petitioner's SIRVA. Order, issued Jan. 27, 2023.
.

predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.    Prior SIRVA Compensation Within SPU[4]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[5] In only 270 of these cases, however, was the amount

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

of damages determined by a special master in a reasoned decision.[6] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[7]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[8] Agreement |
|---|---|---|---|---|
| Total Cases | *270* | *2,206* | *30* | *1,891* |
| Lowest | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| 1st Quartile | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| Median | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| 3rd Quartile | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| Largest | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## B.    Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

---

[6] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[7] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

$250.00 to $1,500.00.[9] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[10]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.    The Parties' Arguments

#### A.    Briefing

Due to a dispute regarding the extent of Petitioner's vaccine-related sequelae, the

---

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[10] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

parties' proposed compensation differs significantly. Petitioner seeks $1,619,823.98, comprised of $19,145.14 for past unreimbursed expenses, $145,951.84 for future unreimbursed expenses, $1,204,727.00 for past and future lost wages, and $250,000.00 for pain and suffering. Petitioner's Motion for Findings of Fact and Conclusions of Law Regarding Damages ("Brief") at 40, filed Dec. 9, 2022, ECF No. 61. In support of this damages demand, Petitioner provided an expert report, curriculum vitae ("CV"), and medical literature from Marko Bodor, M.D., an orthopedist and expert on SIRVA injuries, who treated Petitioner beginning in late-June 2020, more than 32 months post-vaccination. Ex. 45, filed May 19, 2023, ECF No. 69[11]; Exs. 46-49, filed Dec. 9, 2022, ECF No. 62. Petitioner has also filed expert reports and CVs from her vocational expert and economist, extensive documentation related to lost wages and expenses, and documentation related to her application for long-term disability. Exs. 52-72, filed Dec. 9, 2022, ECF No. 63.

The $250,000.00 pain and suffering award Petitioner seeks is comprised of $209,000.00 for past, and $40,100.00 for future pain and suffering. Brief at 32. Petitioner arrives at the future amount based upon an award of $1,000.00 per year for her life expectancy of 40.1 years. *Id.* at 32 n.2. It does not appear, however, that she has reduced any of the future amounts she seeks - for pain and suffering, expenses, or lost wages, to net present value as required by Section 15(f)(4)(A).[12]

To support a pain and suffering award at the top of the Program "cap," Petitioner contrasts her life pre and post-injury. She highlights her prior good health and satisfaction she obtained as mom to two young boys, and work as a pediatric oncology nurse and part-time nurse in the anesthesia unit of a spinal outpatient surgery center, versus her subsequent struggle with chronic pain, right shoulder deficits, anxiety, and depression that "negatively impacted almost every aspect of her life." Brief at 33. Emphasizing the permanent nature of her SIRVA (*id.* at 34), she insists that her "diverse and ongoing sequelae is clearly more severe than most, if not all, of the cases decided in SPU over the last few years" (*id.* at 35).

---

[11] Although this expert report was initially filed on December 9, 2022, it was later discovered to contain a scrivener's error, and a motion to strike the previous expert report was filed on May 19, 2023. ECF No. 68. The same day, Petitioner also filed the corrected expert report. Ex. 45, ECF No. 69.

[12] Additionally, the statutory cap of $250,000.00 must be applied prior to adjusting the award for future pain and suffering to net present value. *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir. 1994); *P.H. v. Sec'y of Health & Hum. Servs.,* No. 14-1112V, 2017 WL 3598108, at *2 (Fed. Cl. Spec. Mstr. July 28, 2017); *see* Section 15(a)(4)(statutory limit for actual and projected pain and suffering); Section 15(f)(4)(A) (requirement regarding net present value).

For comparable decisions, Petitioner points to *Lawson, Schoonover,* and *Hooper*[13] - cases in which the claimant received between $185,000.00 and $205,000.00 in pain and suffering. Brief at 36-39. She notes that the *Schoonover* petitioner was assessed as having a 40 percent disability and thus, also received a future award of $1,200.00 yearly for life. *Id.* at 38 (citing *Schoonover,* 2020 WL 5351341, at *6-7). Acknowledging that the *Lawson* and *Schoonover* petitioners underwent three and two surgeries, respectively, Petitioner maintains that her past award should be similar, albeit slightly more, and that (like the *Schoonover* petitioner) she is also entitled to a future award given the unusual degree of her suffering. *Id.* at 35-38.

Contending that Petitioner's surgical treatment and post-operative care were not related to her SIRVA, Respondent counters that his proffered amount - $57,500.00 for pain and suffering - is appropriate. Respondent's Brief Regarding Damages ("Opp.") at 9-10, filed Dec. 9, 2022, ECF No. 60. He opposes any award for future expenses or lost wages and states only that compensation for past expenses "may be appropriate but . . . must be related to the SIRVA injury." *Id.* at 2 n.2. For comparable cases, he cites *Ramos, Rayborn,* and *Norton*[14] – involving pain and suffering awards ranging from $40,000.00 to $55,000.00. Opp. at 10 n.4.

Although Respondent utilized a vocational expert and economist during the parties' informal discussions, he did not file any reports from these experts. *See,* e.g., Status Report, filed May 25, 2022, ECF No. 52 (discussing the joint evaluation performed by the parties' vocational experts in February 2022). On May 31, 2023, Respondent provided an expert report regarding Petitioner's SIRVA-related sequelae and CV from Brian Feeley, M.D., an orthopedic surgeon and professor at the University of California, San Francisco, School of Medicine. Exs. A-B, ECF No. 73.

In her reply brief, Petitioner criticizes multiple aspects of Dr. Feeley's expert report and reiterates her damages request. Petitioner's Reply Memorandum Regarding Damages ("Reply"), filed July 24, 2023, ECF No. 78. She also filed a rebuttal expert report from Dr. Bodor, accompanied by additional medical literature. Exs. 77-80, ECF Nos. 78-

---

[13] *Lawson v. Sec'y of Health & Hum. Servs.,* No. 18-08882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 for past pain and suffering); *Schoonover v. Sec'y of Health & Hum. Servs.,* No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for past pain and suffering and $1,200.00 per year for life for future pain and suffering); *Hooper v. Sec'y of Health & Hum. Servs.,* No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for past pain and suffering).

[14] *Ramos v. Sec'y of Health & Hum. Servs.,* No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding $40,000.00 for actual pain and suffering); *Rayborn v. Sec'y of Health & Hum. Servs.,* No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,000.00 for actual pain and suffering); *Norton v. Sec'y of Health & Hum. Servs.,* No. 19-1432V, 2021 WL 4805231 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) (awarding $55,000.00 for actual pain and suffering).

1 to 78-4. Noting multiple areas of disagreement between Drs. Feeley and Bodor, she insists that Dr. Feeley's assertions that her adhesive capsulitis, surgery, and chronic regional pain syndrome ("CRPS") were not SIRVA-related are not well-supported and contrary to the findings of her treating orthopedist Dr. Bodor. Reply at 4-9. Petitioner also maintains that Dr. Feeley's report contains several internal inconsistencies, such as his claim that Petitioner's SIRVA-related symptoms did not extend beyond six months but were also improved by treatment administered by Dr. Bodor more than 19-months post-vaccination. *Id.* at 4.

## B.    Expert Reports

The experts agree upon the facts and circumstances in this case, but disagree as to the causes of the symptoms Petitioner experienced. Ex. A. at 6. They set forth analogous recitations of Petitioner's medical history. Ex. 45 at 1-4; Ex. A at 2-3.

Petitioner, a forty-one-year-old nurse and mother of two boys, received the flu vaccine in her right deltoid on November 2, 2018. When seen for right shoulder pain on November 27, 2018, her PCP diagnosed her with tendonitis, bursitis, and weakness of the right shoulder and ordered an MRI. Ex. 9 at 3. The MRI revealed a torn posterior labrum, mild tendinosis of the supraspinatus and infraspinatus tendons without tear, and a small amount of fluid at the subacromial-subdeltoid bursa. Ex. 7 at 22.

Petitioner was thereafter assessed by an orthopedist on December 11, 2018, with bursitis and impingement. Ex. 6 at 6. She began PT in mid-December 2018.  Ex. 4 at 9. Petitioner was diagnosed with a SLAP[15] tear in January 2019 (Ex. 6 at 10), but gained good, albeit temporary, relief from steroid injection administered on January 14 and April 1, 2019. Ex. 6 at 10, 13, 15, 20, 23.

On May 2, 2019, Petitioner underwent arthroscopic surgery consisting of subacromial decompression and open subpectoral tenodesis. Ex. 6 at 28-29. She made slow but steady improvement thereafter, during 31 PT sessions through September 2019. Ex. 21.

Testing performed in September 2019, showed evidence of an autoimmune condition (Ex. 31 at 11), and Petitioner was diagnosed with rheumatoid arthritis in October 2019 (Ex. 16 at 1). She also underwent a second MRI of her right shoulder and MRI of her right arm which revealed new findings: a "[c]hronic appearing rupture of the biceps tendon, retracted distally to the level of the proximal humerus" (Ex. 8 at 12) and "[t]orn

---

[15] A SLAP tear stands for superior labrum anterior-posterior. "SLAP tear surgery is often done to repair torn cartilage in the inner part of your shoulder joint." https://my.clevelandclinic.org/health/treatments/21844-slap-tear-surgery (last visited on Mar. 21, 2025).

and retracted long head biceps tendon" (*id.* at 13), respectively.

During an independent medical evaluation performed in October 2019, for her workers' compensation claim, Petitioner was assessed as having a twelve percent upper extremity impairment, converted to a seven percent whole person impairment rating. Ex. 27 at 125. Estimating her pain as four, ranging from three to eight, and exhibiting limitations in ROM, Petitioner stated that her shoulder had improved by 20 percent and that "her overall capacity [wa]s approximately 10% of her pre-injury status." *Id.* at 123.

Petitioner also visited the emergency room in late October 2019, complaining of "issues in r[igh]t shoulder since surgery in May," specifically duskiness when her arm was hanging down and a bulge in her clavicle area beginning two days after her surgery. Ex. 15 at 29 (capitalized in original). During a late November 2019 visit, a treating neurologist opined that he "strongly suspected that Ms. Garcia has more than one problem," noting her clearly orthopedic issue leading to surgery, her positional numbness and discoloration thereafter which he believed was vascular, and possible denervation in the distribution of the right axillary nerve and possible Parsonage-Turner syndrome. Ex. 22 at 10.

In early 2020, Petitioner sought treatment from another orthopedist (Ex. 26 at 3-4), a chiropractor (Ex. 30 at 1-8), and her rheumatologist who noted improvements in her symptoms with oral steroids (Ex. 29 at 7). She also attended 12 PT sessions in February through March 2020. Ex. 41.

In June 2020, Petitioner had a telehealth appointment with Dr. Bodor, as well as another physician at his clinic in California, Dr. Matt Oglesby. Ex. 32 at 5. They recommended that Petitioner undergo anesthetic blocks to the infraspinatus tendon, likely the area of greatest tenderness that may be associated with SIRVA, and provided her with the name of a local physician who could perform the procedure. *Id.* Instead, Petitioner traveled to California in early September 2020, so Dr. Bodor could administer an anesthesia injection at "[t]he infraspinatus insertion, next to two cortical irregularities." Ex. 37 at 5. Petitioner reported that this injection alleviated her pain, decreasing its intensity from four to zero. *Id.* The next day, Dr. Bodor debrided and aspirated the region using a Tenex surgical technique, a surgical technique using ultrasound imaging that is less invasive than arthroscopic surgery. *Id.* at 1. In October 2020, Petitioner attended four additional PT sessions (Ex. 40 at 17-28), reporting 40% improvement by her third session. *Id.* at 26.

During the second half of 2020, Petitioner continued to see her rheumatologist (Ex. 35 at 3; Ex. 42 at 4; Ex. 44 at 12), a hand therapist (Ex. 38 at 1), and neurologist (Ex. 39 at 9). She returned to her rheumatologist in July 2021, complaining of pain in her joints, right shoulder, and hand, along with difficulties gripping with her right hand. Ex. 44 at 6.

In his initial expert report, Dr. Bodor opined that "[d]eposition of the vaccine into the infraspinatus tendon and subsequent autoimmune inflammation was most likely the source of [Petitioner's] pain. Ex. 45 at 6. Although he acknowledges "that the SLAP tear and supraspinatus partial-thickness tear were most likely than not causing her any pain and would be classified as incidental findings" (*id.*), Dr. Bodor insists that "the next most logical step was for Ms. Garcia to undergo arthroscopy with the goal of repairing her SLAP tear and finding other potential reversible sources for her pain" (*id.* at 5). He notes that when Petitioner underwent her surgery, the ultrasonic aspiration and debridement he performed in September 2020, was not an option as this treatment was first used at his clinic in August 2019, three months after Petitioner's surgery. *Id.* at 6.

Dr. Bodor further links the symptoms Petitioner experienced in her right hand (duskiness, pain, and weakness) to her arthroscopic surgery. Stating that her positive reaction to the treatment he provided in September 2020, confirmed that the infraspinatus tendon insertion was the source of her pain, he attributed the relief Petitioner received from the oral steroids prescribed by her rheumatologist to the medications effect on the inflammation from the vaccine injection. *Id.* at 5-6. Dr. Bodor concluded,

> that Ms. Gracia's residual shoulder, arm, and hand pain and disability stem from either a) ongoing residual vaccine present in the shoulder capsule, causing a local auto-immune response and pain in the shoulder and down the arm or b) the sequelae of surgical debridement of her superior labrum, supraspinatus and biceps tendons and biceps tenodesis, structures which very likely were not causing her any pain or dysfunction, or c) a combination of a) and b).

*Id.* at 6.

In his expert report, Dr. Feeley attributed Petitioner's symptoms to adhesive capsulitis which he maintained could be associated with rheumatoid arthritis. Ex. A at 4. Criticizing Dr. Bodor's view that her initial symptoms were not related to rheumatoid arthritis "since she did not have pain in her other joints," Dr. Feeley noted that Ms. Garcia had "several symptoms consistent with an autoimmune disorder, including labs consistent with rheumatoid arthritis, changes in hand color and strength consistent with rheumatoid arthritis and Raynaud's syndrome, and pain in multiple joints." *Id.* at 6.

Dr. Feeley also opined that the arthroscopic surgery Petitioner underwent was SIRVA-related because its purpose was to address the biceps tendonitis and a SLAP tear, conditions not typical of a SIRVA injury. *Id.* at 6-7. Although he acknowledged that "some of Ms. Garcia's initial symptoms may have been from the vaccine administration,"

he insisted they "were effectively treated by Dr. Bodor." *Id.* at 7. He concluded that Petitioner's chronic conditions (SLAP tear, biceps tendonitis, rheumatoid arthritis, Raynaud's associated hand pain, and CRPS) are not consistent with SIRVA. *Id.*

In his rebuttal expert report, Dr. Bodor criticized as inconsistent Dr. Feeley's argument that Petitioner experienced SIRVA symptoms for only a few months which were relieved by the treatment her provided almost two years later. Ex. 77 at 1. He agreed that Petitioner suffered from adhesive capsulitis, which has sometimes been linked to conditions such as diabetes, but disagreed that there was any connection between it and rheumatoid arthritis - noting that Dr. Feeley did not provide the medical literature that he cited for this preposition. *Id.* Instead, he opined that "adhesive capsulitis is frequently associated with SIRVA," and cited medical literature to support this assertion. *Id.* at 1-2. He also agreed that Petitioner developed CRPS as a result of her surgery which he viewed as vaccine-related. *Id.* at 2.

Dr. Bodor recognized that Petitioner's rheumatoid arthritis was not vaccine-related, stating that "Ms. Garcia had the misfortune of developing both SIRVA and rheumatoid arthritis within the same two years." Ex. 77 at 2. He concluded that "more likely than not, Ms. Garcia's adhesive capsulitis/SIRVA developed well before the acute onset of her rheumatoid arthritis and related symptoms." *Id.*

## IV.    Appropriate Compensation for Past Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In so doing, I consider the record as a whole, including the filed medical records, affidavits, and sworn declarations, plus all assertions made by the parties in written documents. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my ultimate determination on the circumstances of this case.

I find Dr. Bodor's opinion - linking Petitioner's adhesive capsulitis, need for surgery, and later symptoms of CRPS, to the flu vaccine she received - to be persuasive. Dr. Bodor has provided a reasonable explanation of the potential mechanism in this case, whereby the erroneous administration of the flu vaccine into the infraspinatus tendon insertion point was the likely cause of the initial symptoms Petitioner suffered. And his theory is further supported by the relief Petitioner obtained from the treatment he provided in 2020. Unlike Dr. Feeley's assertion that adhesive capsulitis can be linked to rheumatoid arthritis, Dr. Bodor has provided substantial medical literature supporting different aspects of his opinion. *See* e.g*.,* Ex. 78 (describing the type of local inflammation he proposed).

However, *all* of Petitioner's symptoms cannot credibly be linked to the flu vaccine that she received. Even Dr Bodor acknowledged that Petitioner suffered unrelated and simultaneous conditions, specifically a SLAP tear and rheumatoid arthritis, which would account for some of her symptoms. While her SIRVA may have compounded her pain and suffering connected with those comorbid conditions, it did not cause them, and some distinctions should be drawn as a result.

Taking these other conditions into account still reveals that Petitioner suffered a significant SIRVA, accompanied by severe pain levels and moderate limitations in ROM for at least two years post-vaccination. Rather than obtaining relief from the arthroscopic surgery she underwent in May 2019 (seven months post-vaccination), Petitioner experienced an increase in her pain and suffering. She obtained some slow improvements from multiple PT sessions both prior to and following surgery, but gained most of her relief from the treatment Dr. Bodor supplied.

For purposes of determining Petitioner's past pain and suffering award, I find the *Schoonover* case to be most instructive. Like Petitioner, the *Schoonover* petitioner failed to obtain much relief from the first arthroscopic surgery she underwent and experienced accompanying symptoms of depression throughout her injury. *Schoonover,* 2020 WL 5351341, at *4. However, the *Schoonover* petitioner also gained little relief from a second arthroscopic surgery and did not experience the complication of an unrelated condition (rheumatoid arthritis) as Petitioner did. *Id.* Furthermore, the *Schoonover* petitioner had a clear assessment of a 40 percent permanent disability. Id. at *4-5. It is very difficult on the basis of this record to assess whether Petitioner has any ongoing SIRVA symptoms (as opposed to those attributed to rheumatoid arthritis and Raynaud's syndrome) in this case.

Given the above, I find that $190,000.00 is an appropriate award for Petitioner's past pain and suffering. However, I cannot at this point decide the other disputed damages components without additional argument and evidence. Because Respondent argued that Petitioner's SIRVA-related symptoms were not extensive, he did not address the matter of lost wages or unreimbursed expenses. Although I am not inclined to award any future amounts at this point, I am not precluding such a finding if the record is shown to support such determinations.

In light of my ruling, the parties should attempt to informally resolve these other areas of compensation, while simultaneously providing the needed briefing and evidence.

### Conclusion

Based on my consideration of the complete record as a whole and for reasons set forth in this ruling, I find that **$190**,**000.00** **represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

**The parties shall file a joint status report updating me on their efforts to informally resolve all other requested items of compensation in this case no later than** <u>Thursday, April 24, 2025</u>**. In the status report, they should state whether they believe an informal agreement regarding the remainder of damages in this case can be reached.**

**At the same time, Respondent shall continue to finalize and provide his arguments and supporting evidence related to lost wages, and unreimbursed expenses Petitioner seeks. And Petitioner should do the same regarding any future amounts.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master